IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| LOCAL UNION NO. 5 TRUSTEES OF THE BRICKLAYERS AND MASONS', OHIO PENSION FUND, *et al.*, | ) ) ) | CASE NO. 1:19CV1273 |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | KATHLEEN B. BURKE |
| MASONRY CONTRACTING CORPORATION, | ) ) | |
| | ) | |
| Defendant. | ) | **MEMORANDUM OPINION & ORDER** |

Plaintiffs are five affiliates of the Bricklayers and Masons' Local Union No. 5 and the

Northern Ohio Bricklayers and Allied Craftworkers Reginal Training Center Trust (collectively,

"Plaintiffs").[1]  Defendant Masonry Contracting Corporation ("MCC") employs bricklayers who

participate in Plaintiffs' plans and funds.  In their Second Amended Complaint ("SAC"),

Plaintiffs allege that MCC violated Section 515 of the Employee Retirement Income Security

Act of 1974, 29 U.S.C. § 1145 ("ERISA") and Section 301 of the Labor Management Relations

Act, 29 U.S.C. § 185, as amended ("LMRA").  Specifically, they allege that MCC has failed to

pay the correct amount of contributions for its employees and to timely submit the contributions,

due monthly, and the corresponding contribution reports.

Plaintiffs have filed a motion for summary judgment, in which they seek $86,407.20 in

delinquent contributions, $25,798.64 in liquidated damages and interest based on late

---

[1] Plaintiffs include: Trustees of the Bricklayers and Masons' Local Union No. 5, Ohio Pension Fund; Trustees of the Bricklayers and Masons' Local Union No. 5, Ohio Health and Welfare Fund; Bricklayers and Masons' Local Union No. 5, Ohio Vacation and Savings Fund; Bricklayers and Masons' Local No. 5, Ohio Industry and Promotion Fund; Northern Ohio Bricklayers and Allied Craftworkers Regional Training Center Trust; and Bricklayers and Allied Craftworkers Local Union No. 5, Cleveland, Ohio.

contributions, a $50,000 surety bond, and $33,334.77 in attorneys' fees and costs.  Doc. 29-1.

MCC filed an opposition brief (Doc. 32) and Plaintiffs filed a brief in reply (Doc. 35).  For the

reasons explained more fully below, the Court GRANTS Plaintiffs' motion in part.  Because

there is no genuine issue of material fact that MCC owes $86,407.20 in delinquent contributions

and $25,798.64 in liquidated damages and interest, Plaintiffs are entitled to judgment on those

claims.  There is no genuine issue of material fact that MCC owes Plaintiffs attorneys fees and

costs; however, the Court has reduced Plaintiffs' fee award to $28,778.02.  The Court DENIES

Plaintiffs' motion in part to the extent they request a $50,000 bond because Plaintiffs' SAC did

not include a request for a bond.

## I. Background Facts[2]

### A. The parties' relationship

MCC is a masonry corporation that employs bricklayers who participate in the ERISA

and Union funds established by Plaintiffs.  Doc. 23, p. 7, ¶30 (SAC); Doc. 29-3, p. 3, ¶12

(Nielsen declaration); Doc. 30, p. 12 (Birch deposition).  When MCC was formed in 2016, its

President Matthew Birch ("Birch") entered into an Agreement on its behalf with the Ohio

Kentucky Administrative Council District Council of International Union of Bricklayers and

Allied Craft Workers.  Doc. 30, pp. 17-19; Doc. 23, p. 6, ¶ 26; Doc. 35-7 (Masonry Industry

Agreement).  As part of that Agreement, MCC is obligated to abide by the wages, benefit

contributions, and working conditions set forth in any local collective bargaining agreement

(CBA) that covers work in geographical areas where MCC employees perform work.  Doc. 23,

p. 6, ¶ 27; Doc. 27, p. 4., ¶ 27 (Answer); Doc. 35-7, p. 6 (Agreement, Article VII, § A).

---

[2] The background facts are primarily taken from Plaintiffs' filings and supporting documents and are intended to briefly sketch the parties' relationship and describe the current dispute before the Court.  These background facts are largely undisputed, except as described in specific detail in the analysis portion of this opinion.

At all times relevant herein, MCC performed work in geographical areas covered by the Local 5 CBA.  Doc. 23, p. 6, ¶ 28; Doc. 27, p. 4, ¶ 28; Doc. 30, p. 20.  The Local 5 CBA requires MCC to pay Plaintiffs various contributions for each hour worked by its employees and to submit corresponding contribution reports.  Doc. 23, p.7, ¶¶ 29-33; Doc. 27, pp. 4-5, ¶¶ 29-33; Doc. 30, p. 18.; Doc. 35-7, p. 6, Article VII, § A (1)).  The contributions and contribution reports are due by the 15th day of each month.  Doc. 23, p. 11, ¶ 57; Doc. 23-5, p. 1 (Collection Policy).  The contribution reports enable Plaintiffs to calculate the fringe benefits and payroll deductions owed for each month on behalf of the employees.  Doc. 29-3, p. 3, ¶11.

### B. Plaintiffs notify MCC that its contributions are late and request an Audit

Plaintiffs allege that MCC failed to timely remit contributions and contribution reports for all hours its employees worked from June 2017 to November 2019 and March 2020 through April 2020.  Doc. 23, p. 11, ¶60; Doc. 29-3, p. 4, ¶¶20, 21 (Nielsen Affidavit).  Each month, Plaintiffs sent MCC notifications identifying the late contributions and calculating the liquidated damages and interest MCC owed on each late payment.  Doc. 29-3, p. 4, ¶¶20, 21.  MCC did not pay the amount set forth in the notices and it continued to send in late contributions and forms.

On January 18, 2019, Plaintiffs notified MCC that they intended to audit its financial records, as authorized by the Local 5 CBA.  Doc. 23, p. 8, ¶37; Doc. 23-6 (letter).  Plaintiffs allege that MCC failed or refused to provide all documents necessary to complete the audit.  Doc. 23, p. 8, ¶44.  Plaintiffs asked again; again, MCC did not comply.  Doc. 23, p. 8, ¶¶ 45-46.  Thereafter, Plaintiffs sued.

### C. The lawsuit

Initially, Plaintiffs' Complaint sought to compel MCC to submit records so they could perform an audit.  Doc. 1, pp. 9-11 (Complaint).  They also requested any and all unpaid

contributions, interest, liquidated damages uncovered by the audit, and other costs and attorney fees.  Id.  After discussions with the Court, MCC agreed to perform the tasks necessary for an audit, including submitting documentation, and an audit was performed.  Docs. 9, 12, 14, 15.

The Audit Report found that MCC owed $86,407.20 in delinquent contributions for work performed by its participating employees from January 1, 2017 through March 31, 2019.  Doc. 29-9 (Audit Report).  Thereafter, Plaintiffs filed a SAC to include the specific amounts due according to the Audit Report and sought that amount pursuant to §515 of ERISA, 29 U.S.C. § 1145.  Doc. 23, pp. 11-12.  Also pursuant to § 1145, Plaintiffs sought liquidated damages for the total amount of delinquent contributions MCC owed, plus interest, and attorney fees and costs pursuant to §502(g)(2)(D) of ERISA, 29 U.S.C. § 1132(g)(2)(D).  Doc. 23, p. 15, ¶6.  Finally, Plaintiffs sought post-judgment interest pursuant to 28 U.S.C. § 1961.  Doc 23, p. 15, ¶8.

Plaintiffs now move for summary judgment on their claims, requesting a total of $86,407.20 in delinquent contributions based on the Audit Report; $25,798.64 in liquidated damages and interest based on late contributions; a $50,000 surety bond; and $33,334.77 in attorneys' fees and costs.  Doc. 29-1.  MCC opposed Plaintiffs' motion.  Doc. 32.  MCC does not dispute that it is obligated to pay contributions but asserts that the Audit Report was faulty and, therefore, the amount Plaintiffs request is grossly inflated.  It also disputes Plaintiffs' request for liquidated damages, a surety bond, and attorney's fees and costs.

## II. Legal Standard

Rule 56 of the Federal Rules of Civil Procedure provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56.  The movant "bears the initial responsibility of informing the district court of the basis for its motion,

identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, which it believes demonstrates the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal quotations omitted).

After the moving party has carried its initial burden of showing that there are no genuine issues of material fact in dispute, the burden shifts to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986). "Inferences to be drawn from the underlying facts . . . must be viewed in the light most favorable to the party opposing the motion." *Id*. at 587 (internal quotations and citations omitted). However, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Id*. at 586. The non-moving party must present specific facts that demonstrate there is a genuine issue of material fact for trial. *Id*. at 587. "The 'mere possibility' of a factual dispute is not enough." *Mitchell v. Toledo Hosp*., 964 F.2d 577, 582 (6th Cir. 1986).

"Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986). "A genuine issue for trial exists 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Muncie Power Producers, Inc. v. United Techs. Auto., Inc*., 328 F.3d 870, 873 (6th Cir. 2003) (quoting *Anderson*, 477 U.S. at 248). Thus, for a party to avoid summary judgment, "there must be evidence on which a jury could reasonably find for [that party]." *Anderson*, 477 U.S. at 252. Accordingly, in determining whether summary judgment is warranted, a court generally asks, "whether there is evidence upon which a jury can properly proceed to find a verdict for the party producing it, upon whom the onus of proof is imposed." *Id*. (citation omitted).

5

### III. Analysis

**A. There is no dispute that MCC was obligated to make contributions to Plaintiffs per the applicable governing documents**

Plaintiffs allege that MCC was obligated to make fringe benefit contributions to Plaintiffs pursuant to the applicable CBAs and Trust documents to which it was bound and that MCC was obligated to submit to a payroll audit as directed by Plaintiffs.  Doc. 29-1, p. 14.  MCC does not dispute those contentions in its opposition brief.  Rather, MCC disputes the amount of contributions Plaintiffs allege it owes.  Accordingly, there is no dispute that MCC was obligated to make contributions to Plaintiffs per the applicable governing documents.  Therefore, summary judgment is granted to Plaintiff on the issue of contribution liability.  *See Tr. of Michigan Reg'l Council of Carpenters Employee Benefits Fund v. Carpentry Contractors, Inc*., 203 F.R.D. 247, 249-250 (E.D. Mich. 2001) (granting summary judgment to employer on the issue of contribution liability: "The issue of Defendant's liability under the CBAs is not disputed" when the plaintiffs submitted the relevant contracts signed by both parties and the defendant did not contest its obligations under the agreement or ERISA); Doc. 35-7, p. 21 (Masonry Agreement signed by MCC and the Ohio Kentucky Administrative Council District Council of International Union of Bricklayers and Allied Craft Workers)[3]; *Trs. of Painters Union Deposit Fund v. Ybarra Const. Co*., 113 Fed. App'x 664, 667 (6th Cir. 2004) (hereinafter "*Ybarra*") ("ERISA… mandates that a contributing employer make contributions to an employee welfare benefit plan in accordance with the terms of the plans to which it is bound, and trustees of such plans may seek

---

[3] In its opposition brief, MCC notes that Birch, its President, did not sign the Local 5 CBA.  Doc. 32, p. 4. However, MCC does not contest Plaintiffs' assertion that it was required to submit payments pursuant to the agreements, including the Local 5 CBA.  Moreover, in his deposition, Birch agreed that the Masonry Agreement signed by him on behalf of MCC obligates MCC to make contributions to the Local No. 5 fund when performing work in that jurisdiction.  Doc. 30, p. 18 (Birch deposition); see also Doc. 35-7, p. 6 (Masonry Agreement, Art. VII, explaining that the employer will pay contributions according to the local agreements).

judicial enforcement of their terms as third party beneficiaries of the collective bargaining

agreements[,]" citing 29 U.S.C. §§ 1145, 1132(a)).

**B.  There is no genuine issue of material fact that MCC owes Plaintiffs $86,407.20 in contributions based on Plaintiffs' Audit Report.**

Plaintiffs, relying on its Audit Report, alleges that there is no genuine issue of material

fact that MCC owes $86,407.20 in contributions.  Doc. 29-1, pp. 14-15.  MCC disagrees,

contending that there is a genuine issue of material fact regarding the amount of any

contributions it owes.  Doc. 32, p. 15.

As explained in *Ybarra*,

ERISA requires that "every employer shall ... maintain records with respect to each of his employees sufficient to determine the benefits due or which may become due to such employees." [29 U.S.C.] § 1059(a)(1)….An employer may not escape liability for benefits due under labor agreements by failing to keep records as required by statute. *See Mich. Laborers' Health Care Fund v. Grimaldi Concrete, Inc*., 30 F.3d 692, 695 (6th Cir. 1994) (stating that "Section 1059 imposes a clear duty on the employer to maintain adequate records"). If an employer fails to keep adequate records, ERISA shifts the burden to the employer to produce evidence of the amount of work performed and to rebut reasonable inferences that can be drawn from the plaintiff's evidence. *Id*. at 696.

113 F. App'x at 667–68.  When no contradictory evidence is produced by the employer, the

results of the audit should be presumed accurate.  *Id*. at 668 (citing *Grimaldi Concrete*, 30 F.3d

at 697, as "holding employer liable for all hours worked during the period at issue where

employer failed to keep adequate records making it 'impossible to determine with any precision

the amount of contributions' owed."); *see also Michigan Laborers' Health Care Fund v. Taddie

Const., Inc*., 119 F.Supp.2d 698, 703-04 (E.D. Mich. 2000)("Defendants have adduced no

evidence that they had maintained records that would allow a determination of what percentage

of time laborers spent on work covered by the contract. That shifts the burden to Defendants to

disprove Plaintiffs' figures regarding delinquent contributions.").

Here, Plaintiffs rely on the Audit Report, which concluded that MCC owes $86,407.20 in

contributions.  Doc. 29-1, p. 9; Doc. 35, pp. 5-6.  They maintain that the auditor did not receive information that would sufficiently explain the duties and hours worked by the employees, i.e., MCC did not keep adequate records.  Doc. 35, p. 7.  As a result, the auditor calculated the contributions the only way he could: he divided the employees' earnings stated in their W-2s by the rate of their pay to make an initial determination of hours; subtracted the hours MCC had reported to Local 5 and other Bricklayers Locals; subtracted hours identifiable as those performed in MCC's shop, which is outside of Local 5's geographical jurisdiction; and the remaining hours were treated as unaccounted and un-reported to Local 5.  Doc. 35, p. 9; Doc. 35-1 (declaration of auditor Neil Tramer, detailing the deficiencies in the documents he received from MCC, including 84 instances of cross-outs and annotations that made it impossible to determine any delinquent contributions owed by MCC and outlining his subsequent approach to determining those delinquent contributions based on the little information he had).

Similarly, the Audit Report itself details the problems encountered when attempting to evaluate the fringe benefit contributions submitted by MCC.  Doc. 29-9.  The Audit Report cites the following: payroll summary reports by job that had numerous cross-outs and changes; four employees whose union affiliations were inconsistently reported; no paystubs other than, eventually, those belonging to three employees for 2019 and one employee for 2017; and a paystub that was received for 2017 (belonging to employee Kosley) that was inconsistent with MCC's other records because it showed that Kosley worked hours in Local 5's jurisdiction while MCC's records showed that he worked no hours in Local 5's jurisdiction.  The Audit Report further explained,

> The Contractor was asked to sign a management representation letter attesting to the fact that their payroll records were provided to us accurately and in their entirety. The Contractor signed the letter, despite having not provided weekly payroll journals, accurate employee timecards, and pay stubs (as previously mentioned) as asked in the

information request letter. Weekly payroll journals would have allowed us to have a better understanding of where under/over reporting occurred and may have been attribute [sic] those hours to the correct jurisdictions. We were unable to rely on employee timecards and payroll summary reports (as stated previously) because of the numerous strikeouts and pencil ins, many columns not totaling correctly after the strikeouts were taken into consideration.

Doc. 29-9, p. 2.

MCC disagrees with the findings in the Audit Report.  It asserts that it "produced volumes of documents establishing the hours worked by its employees and in what union jurisdiction that work was performed."  Doc. 32, p. 15.  During his deposition, Birch explained how the payroll records he submitted can be read to determine how many hours and in what jurisdiction each employee worked per week.  Doc. 32, p. 7 (citing Birch's deposition, Doc. 30, pp. 28-29).  Accordingly, MCC contends, the burden-shifting described in *Ybarra* does not apply in this case because the documents it submitted to Plaintiffs and the Court create a genuine issue of material fact regarding the amount of contributions owed.  Id.

The Court finds that MCC has neither kept sufficient records nor presented evidence to the Court sufficient to rebut the Audit Report's calculations.

In support of its contention that it "has clearly" presented "evidence that it maintained payroll records that, if properly analyzed, could lead to the calculation of any delinquent contributions," MCC submitted 703 pages of weekly payroll reports covering 2017, 2018, and a portion of 2019.  Doc. 32, p. 15; Docs. 32-1, 32-2, 32-3, 32-4, 32-5 (weekly payroll reports).  As an example of how its payroll records can be properly analyzed to calculate any delinquent contributions, MCC cites the payroll records of Mr. Easton for the last week of December 2018.  Doc. 32, p. 7; see also Doc. 30, pp. 28-29, 31 (Birch deposition discussing the weekly master timesheets and the weekly timesheets for each job).  It points to a "Master Sheet" called "Payroll #1" that shows Easton worked 37 hours on the Innova job for that week.  Doc. 32, p. 7 (citing

Doc. 32-1, p. 1).  It then refers to the "weekly time sheet associated with the Innova job" showing that Eastin worked "5 hours on Sunday December 23, 2018 which is double time; a total of 24 hours from the 26th to the 28th at normal time; and 8 hours on Saturday the 29th at time and a half, for a total of 37 hours."  Doc. 32, p. 7 (citing Doc. 32-1, p. 5).[4]

      While MCC's statement regarding Mr. Easton is illustrated in the documents it cites, those same documents are deficient in other respects.  The weekly time sheet lists hours worked for other employees on certain days but contains no totals for those employees and no corresponding hours on the "Payroll #1" sheet.  For instance, according to the weekly time sheet, bricklayer Mr. Carpenter worked 8 hours on the Innova project on 12/23; the weekly timesheet does not show any hours in the "total hours" column for Carpenter that week and the corresponding "Payroll #1" sheet lists Carpenter as working no hours on the Innova project.  So, too, with respect to Mr. Phillips and Mr. Miles.  Thus, Birch's assertion at his deposition that the actual number of hours worked can be gleaned from the timesheets he submitted (Doc. 30, pp. 26-32) is not borne out by the record.  Rather, a sampling of the payroll records shows that the records are inconsistent with each other and it is not possible, therefore, to determine the correct number of hours worked by each employee.[5]

      Further confusion exists.  While the "Payroll #1" sheet and the supporting weekly

---

[4] The Court observes that the weekly time sheet lists the hours worked as MCC describes, but incorrectly calculates the total as 32 hours, not 37 hours.  Doc. 32-1, p. 5.

[5]  See also, e.g., Doc. 32-1, pp. 1-2 (showing Mr. Hawley working 6.5 hours on the One Seventeen Townhouses project but the corresponding "Payroll #1" sheet shows him working no hours on that project); pp. 1, 6 (showing Mr. Hawley working 40 hours at the MCC shop but the corresponding "Payroll #1" sheet shows him working 32 hours at the MCC shop); p. 10 (handwritten indication that Mr. Carpenter worked his 24 total hours on a Thursday, Friday and Saturday on the VA Outpatient project performing "trucking [illegible]."  A handwritten note at the bottom of the page states, "Kevin Thurs and Fri trucking," but his 8 overtime hours worked on Saturday, which apparently were not spent "trucking," were not counted.  See Doc. 32-1, p. 9 (master sheet called Payroll #2 listing no hours for Carpenter for the VA Outpatient job that week)).

timesheets discussed above indicates that the weekly pay period began on Sunday, December 23, and ran to Saturday, December 29, 2018, the corresponding "Paycheck Detail" sheet also provided by MCC indicates that the weekly pay period began on Monday, December 24, and ran until Sunday, December 30, 2018.  Doc. 32-1, p. 7.  In other words, the paycheck detail sheets don't correspond with the weekly timesheets.  And it is incomplete, as certain employees' names are missing.  Doc. 32-1, p. 7 ("Paycheck Detail" sheet listing numerous employees but not, e.g., Mr. Carpenter).[6]

Finally, the weekly timesheets have numerous, hand-written alterations, some of which purport to state the correct sum but have been added incorrectly.  For example, this is a portion of the weekly timesheet for the Innova job during the week beginning on December 30, 2018:



Doc. 32-1, p. 15.  Although 8 hours (in red) were added to reflect that Mr. Persinger worked an additional 8 hours, the result was that, illogically, 6 hours were subtracted from his 16 total hours leaving him with a new total of 10 hours instead of what should have been 24 hours.  This apparent miscalculation was reflected in the corresponding Payroll #2 sheet.  Doc. 32-1, p. 9 (listing Persinger as having worked 10 hours on the Innova project).  The additional 8 hours

---

[6]  Although the Payroll #1 sheet lists Mr. Carpenter as only having worked the "shop or other" job during the relevant week, it also lists Mr. Miles as only having worked the "shop or other" job during that week, yet Miles's name is listed on the paycheck detail sheet while Carpenter's name is not.

added to Mr. Noel (in red) for the same day was not reflected on the corresponding Payroll #2 sheet.  See Doc. 32-1, p. 9 (showing Noel as having worked no hours on the Innova project).  Finally, nowhere is it indicated when these handwritten changes were made.

Below is another example of hand-made alterations from the week beginning July 2, 2017:



Doc. 32-4, p. 17.[7]  See also, e.g., Doc. 32-4, pp. 6, 8, 11, 16, 17, 24 (sampling of additional handwritten alterations); Doc. 35-1, pp. 2-3, ¶¶9-12 (Tramer declaration, in which he explains that the documents he received from MCC contained at least 39 instances of cross-outs and annotations in the summary reports and summary reports by job in 2017 and 45 instances in 2018, which "were so extensive and resulted in such inconsistently added-up hours that, in my professional capacity, I was not able to rely on weekly payroll summary reports and weekly payroll summary reports by job for the purposes of determining any delinquent hours owed by MCC."); Doc. 29-9, p. 1 (Audit Report, explaining that it was "not able to rely on the payroll summary reports (by virtue of the numerous cross-outs and our inability to tie them to any journals or records)").  Simply put, it is impossible to interpret the handwritten alterations in

---

[7]  Additionally, this weekly timesheet purports to be for the project called "First Alliance Children & Families," but there is no such job column in the corresponding "Payroll # 28."  Rather, it appears that MCC included a color key at the bottom of the sheet that corresponds to other job locations, some of which are included on the Payroll #28 sheet and some that are not.

order to determine with any precision the amount of contributions MCC owed.  *Grimaldi Concrete*, 30 F.3d at 697.

In sum, MCC has not kept adequate records, nor has it produced evidence of the amount of work performed by its employees to rebut the reasonable inferences that can be drawn from the Audit Report.  Therefore, the results of the audit are presumed accurate.  *Ybarra*, 113 Fed. App'x 664, 667–68, 696; *Grimaldi Concrete*, 30 F.3d at 697.  Although Birch, in his deposition, claimed that he "disagree[s]" with the Auditor's Report (Doc. 30, p. 27), his claims of inaccuracy are unsupported and, therefore, "insufficient to create a material issue of fact."  *PACE Indus. Union-Mgmt. Pension Fund v. Dannex Mfg. Co*., 394 Fed. App'x 188, 197 (6th Cir. 2010) ("Dannex did not keep its employment records in an accessible format, and never came forward with evidence to rebut the audit's calculations …. Instead, Dannex relies on unsupported claims of inaccuracy. These are insufficient to create a material issue of fact.").

MCC complains that the Audit Report incorrectly calculated contributions for its three supervisory employees, whom, it asserts, are not subject to fringe benefit payments.  Doc. 32, p. 9; Doc. 32-12, p. 3, ¶¶30-35 (Birch affidavit).  In his affidavit, Birch asserts, "records accurately reflect the times salaried employees performed covered work and the time they performed management supervisory non-covered work."  Doc. 32-12, p. 3, ¶35.  He does not identify a specific record from which the auditor (or this Court) could know that an employee was performing supervisory work.  See also Doc. 35-1, p. 2, ¶8 (Tramer declaration stating, "The information received from MCC was insufficient to explain the roles and hours worked by salaried employees.  Despite my office's request for more information, MCC instead insisted that I rely [on] the documents already produced.  Given these documents' inability to corroborate the salaried status and duties of any employees identified as such, I was forced to determine their

hours worked as unreported to Plaintiffs.").[8]  Thus, MCC did not and has not produced any evidence showing that MCC had supervisory employees who performed specific work that MCC was not obligated to pay contributions on.

Finally, MCC submits that the difference between the auditor's calculation and Birch's calculation is due to how the calculation of overtime and double time hours should have been reported.  Doc. 32, pp. 11-12.  MCC complains that the auditor divided an employee's total wages by the hourly pay rate to determine the number of hours each employee worked.  Doc. 32, p. 9.  It asserts that that method doesn't account for the fact that the employees' total wages included overtime wages (1.5 x the regular rate) and double time wages (2 x the regular rate).  But it is impossible to figure out how many overtime and double time hours the employees worked because MCC did not keep adequate records, as detailed fully above.[9]

For all the reasons stated above, MCC has not shown that there is a genuine issue of material fact that MCC owes $86,407.20 in contributions based on Plaintiffs' Audit Report.

---

[8] At his deposition Birch testified that he does not have any supervisory employees:

> Q. Does Masonry Contracting currently have any supervisory personnel and/or managers?
> A [Birch]. No.
> Q. I'm sorry?
> A. No.
> Q. Okay. At the risk of repeating, I'm going to ask a slightly different question. Does Masonry Contracting employ anyone in a supervisory function?
> A. We employ bricklayer foremen only. There are no other supervisors other than myself.

Doc. 30, p. 12.  When asked at his deposition why his calculation was so different from the Audit Report's calculation, Birch only stated that it was because of the way overtime was calculated.  Doc. 30, pp. 46-47.  He did not identify the misidentification or miscalculation of supervisory employees as a reason.

[9]  Moreover, per the parties' agreements, certain funds were required to be paid on a pro rata basis according to the hourly rate.  So, for overtime hours, 1.5 times the regular rate of contribution was due and, for double time hours, 2 times the regular rate of contribution was due.  See, e.g., Doc. 30-2, pp. 19-20 (CBA); Doc. 35-5, p. 11, §1 (Pension Fund); Doc. 35-6, p. 11, §1 (Health & Welfare Trust Agreement).  As a result, the amount of those contributions due is the same whether one calculates it using Birch's method (counting double time hours as one hour but at twice the rate of contribution) or the auditor's method (counting double time hours as two hours but each hour at the regular rate of contribution).  See also Doc. 32-12, p. 4, ¶37 (Birch affidavit agreeing that fringe benefit payments increase when an employee works overtime or double time).

Accordingly, Plaintiffs are entitled to summary judgment on that claim.

### C. There is no genuine issue of material fact that MCC owes $25,798.64 in liquidated damages

Plaintiffs assert that they are entitled to liquidated damages of $25,798.64 for MCC's failure to make timely contributions.  Doc. 29-1, p. 16; Doc. 35, p. 11.

"[A] party may seek damages for failure to make timely contributions as stipulated by the provisions of the collective bargaining agreement provided that such damages do not constitute a penalty under federal common law."  *Bds. of Trs. of Ohio Laborers' Fringe Benefits Programs v. LA Williams Constr., LLC*, 2017 WL 2858277, at *4 (S.D. Ohio July 5, 2017) (citing *Mich. Carpenters Council Health & Welfare Fund v. C.J. Rogers, Inc.*, 933 F.2d 376, 389-90 (6th Cir. 1991)).  "The Sixth Circuit has held that a provision for liquidated damages must meet two requirements to be enforceable: (1) the harm resulting from the breach must be very difficult or impossible to estimate; and (2) the amount fixed must be a reasonable forecast of just compensation for the harm caused."  *Id.*, (quoting *Bricklayers Pension Trust Fund v. Rosati, Inc.*, 23 Fed.App'x 360 (6th Cir. 2001) (internal quotation marks omitted)).

Plaintiffs assert that "the evidentiary record establishes that it is undisputed that MCC owes $25,798.64 in liquidated damages and interest to Plaintiffs based on its failure and/or refusal to timely return copies of all required Contribution Reporting Forms and timely remit contributions."  Doc. 29-1, p. 17.  In support, they cite the affidavit of Laurel Nielsen, the ERISA Funds' Administrative Office Manager, who is responsible for computing the liquidated damages and interest owed by contributing employers due to late payments.  Id. (citing Doc. 29-8, Nielsen affidavit).  In her affidavit, Nielsen states that she computed the liquidated damages "using the formulation contained in the Collection Policy."  Doc. 29-3, p. 4, ¶19.  The collection policy, drafted by the Trustees and submitted as an attachment to her declaration, states,

> Any Employer delinquent with regard to required contributions shall pay, in addition to such delinquencies, liquidated damages in the amount of 5% of the delinquent contribution amount, plus 1 ½% per month.

Doc. 29-8, p. 3, ¶11.  Additionally, the liquidated damages notices sent to MCC calculated a 5% charge for the late contributions and added .18% interest.  See Doc. 30-9 (liquidated damages notices sent to MCC).

MCC complains that the CBA provision relied on by Plaintiffs is "vague."  Doc. 32, p. 18.  Article VI(3)(d) of the Local 5 CBA, entitled "Management, Administration and Qualifications of the Funds—Rights and Remedies as to Delinquent Employers" states, "The Employers will abide by all rules and regulations duly adopted by Funds' Trustees, including such, which from time to time impose administrative interest expenses and assessment charges on delinquent Employer reports and remittance[.]"  Doc. 35, pp. 10-11.  Plaintiffs assert that that provision incorporates by reference the Trustee's collection policy, which, in turn, specifies the amount of damages.  Doc. 35, p. 10.

The Court finds that the CBA references rules and regulations that includes charges and interest on delinquent reports and remittance sufficient to put MCC on notice that such charges and interest would be assessed, and the collection policy specifically set forth how those charges and interest would be calculated.  In *Bricklayers Pension Trust Fund v. Rosati, Inc*., 23 Fed. App'x 360, 362 (6th Cir. 2001), the Sixth Circuit affirmed the trial court's grant of summary judgment to the union, rejecting the employer's argument that the CBA was "vague" because it did not set out the percentages for liquidated damages.  The employer also argued that it could not be bound to a separate schedule that had been created by the trustees setting forth a flat fee rate per employee plus interest for liquidated damages.  The Court found that the employer willingly signed the CBA, the schedule was available to the employer to review if it wished, and,

16

therefore, "Defendant cannot now be heard to claim that the provision is unenforceable for indefiniteness."  Similarly, here, the CBA stated that the Trustees will impose charges and interest on delinquent employer reports and remittance.  The Trustees adopted a separate collection policy setting forth a specific 5% rate of liquidated damages and 1.5% interest rate for delinquent contributions that were not paid by the 15th of each month.  MCC complied with the collection policy by sending in monthly reports and remittance, albeit late.  And the Union, in turn, sent MCC monthly liquidated damages notices assessing a 5% liquidated damage fee on delinquent contributions and a .18% interest rate.  Doc. 30-9 (liquidated damages notices calculating damages based on 5% of the delinquent contributions and adding an .18% interest charge); Doc. 30, p. 42 (Birch deposition in which he states that he "probably did" receive the notices and that "I wouldn't have agreed to them had I not.").

MCC does not challenge the percentages set out in the collection policy or the calculations.  A liquidation damages charge of 5% of the delinquent contribution and .18% interest are reasonable.  *See, e.g.*, *Plumbers Local 98 Defined Benefit Pension Fund v. Premier Plumbing & Mech., LLC*, 2006 WL 2623370, at *4 (E.D. Mich. Aug. 11, 2006) (finding that a 10% liquidated damages fee for delinquent contributions "is likely a reasonable forecast of harm because it is proportionate to the magnitude of the breach" and not "an inflexible lump sum payment."); *LA Williams Constr.*, 2017 WL 2858277, at *4 (10% liquidated damage fee for delinquent contributions and 1% interest enforceable).

Finally, MCC argues that, when Birch "first approached Plaintiff about MCC becoming a part of the union, he made it clear to Plaintiff's agent that since MCC was a start-up, he was not going to be able to make timely fringe benefit contributions."  Doc. 32, p. 18.  Birch explained to Plaintiffs' agent that "he would have to wait until he got paid before he paid the fringes" and that

17

"Plaintiff's agent indicated that would be fine but [to] not get too far behind."  Doc. 32, p. 18;

Doc. 30, pp. 21-22, 24-25.  Even accepting MCC's assertion as true,[10] as the Court is required to

do at the summary judgment stage, MCC's argument fails.  An oral agreement cannot modify the

parties' written agreements.  *Central States Southeast and Southwest Areas Pension Fund v.*

*Behnke, Inc*., 883 F.2d 454, 459 (6th Cir. 1989) ("The problem with Behnke's reliance on the

oral CBA regarding its obligation to make contributions to Central States, however, is that the

LMRA and ERISA require employer contributions to trust funds on behalf of employees to be

pursuant to detailed *written* agreements specifying the employer's duty to contribute.")(emphasis

in original); *Bd. of Trs. of Ohio Carpenters' Pension Fund v. Kovco Carpentry*, 2006 WL

3742266, at *2–3 (N.D. Ohio Dec. 15, 2006) ("Kovco merely makes unsupported, conclusory

arguments that it does not now owe those amounts because a union representative allegedly

made some sort of oral agreement with Kovco, an agreement which did not comport with the

express terms of the CBA….Of course, no union representative would have the authority to

modify the terms of the CBA.  Kovco's responsibilities under the CBA are clear and

unequivocal[,]" citing *Behnke*); *Michigan Elec. Employees Pension Fund v. Encompass Elec. &*

*Data, Inc*., 556 F.Supp.2d 746, 765 (W.D. Mich. 2008) (rejecting the defendant's assertion that a

union representative gave oral assurances that it would not be required to pay benefits required

by the CBAs until it "got on its feet" and could afford it; "As a matter of law under *Behnke*, the

parties here could not orally modify the letters of assent so as to eliminate, reduce, or vary Data's

obligation to pay the benefits expressly guaranteed by the written CBAs.").

    In sum, there is no genuine issue of material fact that Plaintiffs are entitled to collect

$25,798.64 in liquidated damages from MCC.  Accordingly, summary judgment is granted to

---

[10]  Plaintiffs dispute that such an oral assertion was made by their agent.  Doc. 35-4, p. 3, ¶¶16-19 (declaration of
Trustee David J. Wondolowski).

Plaintiffs on that claim.

### D. Plaintiffs are not entitled to a surety bond

Plaintiffs allege that, pursuant to the parties' agreements, MCC is obligated to post a $50,000 bond.  Doc. 29-1, p. 11.  Plaintiffs assert that, because there is no dispute that MCC is obliged to post a $50,000 bond and MCC has not posted any bond, they are entitled to summary judgment on that "claim."  Doc. 29-1, pp. 13, 18-19.  MCC objects to Plaintiffs' request for a bond, arguing that Plaintiffs did not request a bond or mention its failure to post a bond "anywhere in the 85 Paragraphs of the Second Amended Complaint."  Doc. 32, p. 19.  MCC further alleges that, per the Masonry Agreement, Plaintiffs were required to follow a grievance procedure to remedy any failure of MCC to post a bond and that Plaintiffs have not followed that procedure.  Doc. 32, pp. 19-20.  MCC submits that it "did not have a bond for three years and it was never requested from the union."  Doc. 32, p. 20.  In reply, Plaintiffs assert that their "bond claim is properly before the Court."  Doc. 35, p. 13.

In support of their assertion that their bond "claim" is properly before the Court, Plaintiffs rely on *In Trustees of the Heating, Piping & Refrigeration Pension Fund v. Engineering Contractors, Inc*., 2013 WL 1498912, *2 (D.Md. Apr. 9, 2013).  Plaintiffs assert that, in that ERISA collections action filed under 29 U.S.C. § 1145, the plaintiffs asked for a bond in their motion for summary judgment based on the terms of the parties' agreements and the court "treated such a request and claim as properly before it."  Doc. 35, p. 13.  However, in *Engineering Contractors* the plaintiffs' summary judgment motion was unopposed.  Therefore, the court did not discuss any arguments raised by the defendant, including whether the request for a bond was included in the complaint.

A review of the SAC in this case confirms that Plaintiffs did not state a claim regarding a

bond or even mention a bond.  Rather, the SAC states, as the last item in the Prayer for Relief, "Such other legal or equitable relief as this Court deems appropriate."  Doc. 23, p. 15.  That request is insufficient to state a claim for a $50,000 bond or to put MCC on notice that Plaintiffs are seeking a $50,000 bond as a form of equitable relief.  Accordingly, the Court finds that Plaintiffs are not entitled to a bond because they did not include such a claim or request for relief in their SAC.  *See, e.g.*, *Tucker v. Union of Needletrades, Indus. & Textile Employees*, 407 F.3d 784, 789 (6th Cir. 2005) (affirming the district court's refusal to consider a claim raised for the first time at the summary judgment stage when the new claim had not been pled, there was nothing in the complaint to put defendants on notice of the claim, and the plaintiff had the information on which to base that claim when she filed her complaint but did not include it or seek leave to amend to add it); *Lally v. BP Prod. N. Am., Inc.*, 615 F. Supp. 2d 654, 659 (N.D. Ohio 2009) (finding that the plaintiffs could not "expand the scope of their claims" at the summary judgment stage); *Davis v. Echo Valley Condo. Ass'n*, 945 F.3d 483, 496 (6th Cir. 2019), *cert. denied*, 141 S. Ct. 162 (2020) ("Parties who seek to raise new claims at the summary-judgment stage must first move to amend their pleadings under Federal Rule of Civil Procedure 15(a) before asserting the claims in summary-judgment briefing.").

### E. Plaintiffs are entitled to $28,778.02 in attorney fees and costs

#### 1. An award of fees and costs is mandatory

Plaintiffs argue that, pursuant to 29 U.S.C. § 1132(g)(2), an award of attorney fees and costs in this case is mandatory and they are entitled to $33,334.77 in fees and costs.  Doc. 29-2, pp. 19-21.  MCC opposed Plaintiffs' request for fees and costs and submits that an award of fees and costs in this case is discretionary.  Doc. 32, p. 20.

29 U.S.C. § 1132(g) provides,

(g) Attorney's fees and costs; awards in actions involving delinquent contributions

> (1) In any action under this subchapter (other than an action described in paragraph (2)) by a participant, beneficiary, or fiduciary, the court in its discretion may allow a reasonable attorney's fee and costs of action to either party.

> (2) In any action under this subchapter by a fiduciary for or on behalf of a plan to enforce section 1145 of this title in which a judgment in favor of the plan is awarded, the court <u>shall</u> award the plan—

> > \*        \*        \*

> > (D) reasonable attorney's fees and costs of the action, to be paid by the defendant[.]

*Id.* (emphasis supplied).  Because Plaintiffs brought this action under ERISA on behalf of a plan to enforce § 1145 (unpaid contributions) and because judgment is awarded in favor of Plaintiffs, this case falls under § 1132 (g)(2) and an award of fees and costs is mandatory, not discretionary. *See also Local Union No. 33 Trustees of Sheet Metal Workers' Akron Dist. Pension Fund v. Map Heating & Cooling, LLC*, 2010 WL 1995654, at \*4-5 (N.D. Ohio May 19, 2010) (award of attorney fees is mandatory under § 1132(g)(2)); *LA Williams Constr.*, 2017 WL 2858277, at \*3 (same).[11]

MCC also objects to Plaintiffs request for attorney fees and costs because, it alleges, the request is "premature" and because Plaintiffs "have not adduced any evidence to support its claim."  Doc. 32, p. 20.  To the extent that MCC alleges Plaintiffs' request is premature (without further explanation), the Court finds that the request is not premature.  *See, e.g.*, *Map Heating & Cooling*, *supra*, (awarding attorney fees and costs as requested in the plaintiffs' summary judgment motion); *LA Williams Constr.*, *supra*, (same).  To the extent MCC contends that

---

[11] In support of its argument that fees and costs are discretionary, MCC relies upon *Taddie*, 119 F.Supp.2d at 704, which, in turn, relied upon *Secretary of Dept. of Labor v. King*, 775 F.2d 666, 669 (6th Cir. 1985)).  However, in *King*, an award of fees was discretionary because that case fell under § 1132(g)(1), not § 1132(g)(2) as this case does.

Plaintiffs have not "adduced any evidence to support its claim," that contention is meritless, as Plaintiffs have provided evidence in the form of an attorney affidavit and billing records, as discussed in more detail below.

### 2. The amount of fees using the "lodestar" method

To determine reasonable attorney fees, the Court uses the "lodestar" method: it calculates "the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate." *Id*. (quoting *Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983)).  The Court determines the reasonableness of an attorneys' fee award based on "evidence supporting the hours worked and rates claimed."  *Id*.; *Hensley*, 461 U.S. at 433; *The Ne. Ohio Coal. for the Homeless v. Husted*, 831 F.3d 686, 702 (6th Cir. 2016).

### a. Reasonable rate

To determine a reasonable hourly rate, a court looks to the prevailing market rate within the relevant community, i.e., the venue of the court.  *Id*. at 715.  The court may also consider "a party's submissions, awards in analogous cases, state bar association guidelines, and its own knowledge and experience in handling similar fee requests."  *Id*. at 716 (quoting *Van Horn v. Nationwide Pro. & Cas. Ins*., 436 Fed. App'x 496, 499 (6th Cir. 2011)).

Here, Plaintiffs provide the affidavit of Attorney George H. Faulkner, a partner at the Cleveland, Ohio law firm of Faulkner, Hoffman & Phillips, LLC, who has "represented Taft-Hartley benefit plans in all areas of litigation, plan design, ERISA compliance, and general operational issues" for the past 35 years.  Doc. 29-11, ¶2.  Faulkner lists the name of each attorney from his firm who performed work on this case, the number of years that attorney has been licensed to practice, the number of hours he or she worked on this case, and the hourly rate for each:

| Name | Date licensed | Hourly rate | Hours worked |
|------|---------------|-------------|--------------|
| Joseph C. Hoffman, Jr. (partner) | 1991 | $250 | 19 |
| Joseph D. Mando (partner) | 2007 | $250 | 5 |
| Jonah D. Grabelsky (associate) | 2012 | $225 | 100.5 |
| Alanna Klein Fischer (associate) | 2013 | $225 | 1.75 |
| David M. Pixley (associate) | 2008 | $225 | 16 |

Doc. 29-11, pp. 1-3, ¶¶3-13.

MCC does not object to the hourly rates listed for the above attorneys.  Courts in this district have found hourly rates of $250 for partners and $225 for associates to be reasonable for ERISA litigation.  *See Dirs. of Ohio Conference of Plasterers & Cement Masons Combined Funds, Inc. v. Akron Insulation & Supply, Inc*., 2019 WL 2513819, at *3 (N.D. Ohio June 18, 2019) (approving the requested $200/hour for partners and $185/hour for associates and collecting cases finding that $250 and above for partners and $235 for associates was reasonable).  Accordingly, the Court finds that the hourly rates requested by Plaintiffs for each attorney are reasonable.

### b. Reasonable hours

When determining the number of reasonable hours, itemized billing records are sufficient when the record entries specify the date; the individual recording the time; the hours billed; the specific task completed; and the identity of the client.  *LA Williams Constr*., 2017 WL 2858277, at *4 (citing *Imwalle v. Reliance Med. Prod., Inc*., 515 F.3d 531, 554 (6th Cir. 2008)).  Moreover, explicitly detailed descriptions for each entry are not required.  *Id*. (citing *McCombs v. Meijer, Inc*., 395 F.3d 346, 360 (6th Cir. 2005)); *Hensley*, 461 U.S. at 437 n.12 (Plaintiffs' counsel is not "required to record in great detail how each minute of his time was expended" but "should identify the general subject matter of his time expenditures.").

Here, Plaintiffs allege that their attorneys worked 142.50 hours on this case.  Doc. 29-1,

p. 22.  In support, they submitted a fee bill attested to by Attorney Faulkner.  Doc. 29-11

(Faulkner affidavit); Doc. 29-12 (fee bill).  The fee bill lists the date of each entry, the individual

recording the time, the hours (or fractions of hours) billed, the hourly rate for the individual

performing the tasks, the specific tasks completed, and the identity of the client.  Id.

Accordingly, the fee bill is sufficient evidence of the hours billed by Plaintiffs for work on this

case.  *See LA Williams Constr.*, 2017 WL 2858277, at *4.

MCC raises specific objections to certain entries billed by Plaintiffs.  Doc. 32, pp. 21-22

(listing six objections).  The Court addresses those items in turn.

1. One hour to prepare summons, a cover sheet, and electronically file a pleading.  Doc.

29-12, p. 2.  MCC complains that, on June 3, 2019, Plaintiffs billed one hour to prepare a cover

sheet and electronically file a pleading; tasks, MCC asserts, "that should have taken no more

than fifteen minutes" and are "a purely clerical or secretarial activity … not billable at a

paralegals rate because such tasks are included in office overhead."  Doc. 32, p. 21 (citing

*Gibson v. Scott*, 2014 WL 661716, at *4 (S.D. Ohio Feb. 19, 2014) (noting that purely clerical or

secretarial tasks should not be billed, even at a paralegal rate, because "[h]ours that are not

properly billed to one's client also are not properly billed to one's adversary pursuant to statutory

authority[,]" quoting *Hensley*, 461 U.S. at 437, and citing *Missouri v. Jenkins*, 491 U.S. 274, 288

n. 10 (1989) ("[P]urely clerical or secretarial tasks should not be billed at a paralegal rate,

regardless of who performs them.").  In reply, Plaintiffs assert, "activities such as filing a

complaint, filing service requests, and filing return-of-service forms are clerical tasks that may

be considered sufficiently 'legal work' to permit compensation, although any compensation

would be at a lesser rate."  Doc. 35, p. 18 (citing *Rodriguez v. Astrue*, 2012 WL 2905928, *3

(N.D. Ohio July 16, 2012).  They submit that the tasks—preparing the summons and cover sheet

and electronically file a complaint with large, multiple exhibits—are compensable and were performed at a lesser paralegal rate of $95/hour.

The Court finds that the work performed on June 3, 2019, "Prepare summons & civil cover sheet & electronically file Complaint," is not purely clerical or secretarial and is, therefore, billable at the paralegal rate. *See Rodriquez*, 2012 WL 2905928, *3 (preparing and filing complaint is billable work at a paralegal rate); *c.f. Gibson*, 2014 WL 661716, at *4 (describing non-billable clerical or secretarial tasks as "organiz[ing] file," "get check for public records," "copy and send documents to client," and "get notebooks and dividers."). Moreover, the Court finds that the one hour spent performing those tasks was not excessive, as the complaint and nine supporting exhibits total 190 pages.

2. <u>Print filed complaint for service; prepare correspondence & envelopes for service by the Clerk, and open file</u>. Doc. 29-12, p. 2. MCC complains that, on June 4, 2019, Plaintiffs billed 1.5 hours at $95/hour to "Print Filed complaint for service; prepare correspondence & envelopes for service by the Clerk, and open file." Doc. 32, p. 21. This, MCC asserts, is unbillable clerical activity and, moreover, should not take 1.5 hours. Id. Plaintiffs assert that those activities are "considered sufficiently legal," relying on *Rodriguez*. Doc. 35, p. 18. However, *Rodriguez* did not consider printing and preparing envelopes. Those activities are purely clerical or secretarial tasks and not billable. *Gibson*, 2014 WL 661716, at *4. Accordingly, $142.50 ($95 x 1.5 hours) will be subtracted from the amount of fees recovered by Plaintiffs.

3. <u>Review assignment of judge & magistrate judge</u>. Doc. 29-12, p. 2. MCC complains that, on June 4, 2019, Plaintiffs billed one quarter hour (15 minutes) at $225/hour for "Review assignment of judge & magistrate judge." Doc. 32, p. 22. MCC asserts that this is clerical work

and should not take more than five minutes.  Id.  Plaintiffs disagree; they submit that "the purpose of reviewing such assignments is to research the Court personnel with whom counsel will be interfacing as part of an overall legal strategy" which "is properly compensable time as legal work," citing *U.S. v. Oaks, Ltd.*, 798 F.2d 1417, 1986 WL 17277, *3 (6th Cir. July 11, 1986).  Doc. 35, pp. 18-19.  But *Oaks* did not discuss whether reviewing the judicial officer assigned to the case is compensable or is generally considered part of an overall legal strategy.[12]  Reviewing the names of the judicial officers assigned to the case has been found not to be compensable.  *See, e.g., Bernhart v. Comm'r of Soc. Sec.*, 2013 WL 3822141, at *3 (N.D. Ohio July 23, 2013) (reviewing court email notices "regarding the completion of service and the assignment of a judge and magistrate judge" were non-compensable, overhead-type work and, additionally, overbilled at 6 minutes as it takes "roughly thirty seconds.").  Accordingly, Plaintiffs are not entitled to the $56.25 counsel billed for this task.

4. <u>Six hours to research federal law and rules regarding time to file an answer.</u>[13]  Doc. 29-12, p. 4.  MCC complains that, on July 15, 2019, attorney Grabelsky spent six hours confirming that federal law and rules require an answer to be filed within 21 days, which, MCC submits, "is clearly stated in the Local Rules and should take no more than five minutes to research."  Doc. 32, p. 22.  Grabelsky also performed the following tasks during those six hours: emailed his findings to co-counsel Pixley, conducted a conference call with Pixley and "Court Clerk to determine course of action in light of untimely answer & discuss findings in light of federal law confirming same."  Doc. 29-12, p. 2.  Plaintiffs assert, "These were all legal matters that

---

[12]  The Court in *Oaks* merely mentioned some of the work the attorney performed as counsel for the receiver appointed in a foreclosure action, including "determining financial strategies," a task, moreover, that the Sixth Circuit labeled "neither complex nor difficult" while cutting the district court's fee award to counsel by nearly one-third.  1986 WL 17277, *3, 5.

[13]  The docket reflects that MCC's representative Michael Birch was served on June 10, 2019, and MCC filed its Answer on July 2, 2019, 22 days after service.

involved research, discussion, and discretion by counsel, thereby making the six hours spent reasonable." Doc. 35, p. 19. The Court disagrees that six hours spent performing those tasks—alone, with co-counsel, or the "Court Clerk," to confirm that a party's answer is due 21 days after service of the complaint—is reasonable. Thus, the Court will award 1 hour for time spent on this issue. Accordingly, the overall fee award will be reduced by $1,125 ($225 x 5 hours).

   5. Thirty minutes spent reviewing discovery and dispositive motions dates and status. Doc. 29-12, p. 13. MCC complains that, on January 28, 2020, attorney Hoffman billed a half hour to review discovery and dispositive motion dates and status. Doc. 35, p. 22. It asserts that task "arguably could have been done by a paralegal, or as clerical work included in office overhead and should not have taken more than 10 minutes." Id. Plaintiffs argue that reviewing case management dates is legal activity and can reasonably take half an hour. Doc. 35, p. 19. The Court agrees that checking case management dates can be considered legal work, but it does not take half an hour. Accordingly, the $125 charged for this task is reduced by $83 to $42, which accounts for roughly ten minutes of work.

   6. Researching and drafting motion for leave to file amended complaint. Doc. 29-12, pp. 13-14. MCC complains that Plaintiffs' counsel block billed numerous hours for researching and drafting a motion for leave to file a SAC. Doc. 32, p. 22. Plaintiffs' counsel block billed a total of 17 hours researching and drafting a motion for leave to file a SAC, and an additional 4 hours spent drafting the SAC.[14] Plaintiffs assert that the time spent was reasonable. Doc. 35, pp. 19-20.

   The Court notes that Plaintiffs filed their Motion for Leave to File a Second Amended

---

[14] The 17 hours spent researching or drafting the motion for leave are as follows: on 1/30/20, 3 hours; on 1/31/20, 1 hour; on 2/5/20, 4 hours; and on 2/6/20, 9 hours.

Complaint on February 6, 2020, but they had previously filed a Motion for Leave to File a First Amended Complaint on December 6, 2019.  Some overlap exists in those two motions, so less time was necessary to research and draft the second Motion.[15]  Furthermore, the second Motion was only granted in part; it was denied to the extent Plaintiffs sought to add Matthew Birch as an individual defendant because they had not shown good cause for their delay in seeking to add him and he would be prejudiced by the delay.  Thus, the amount of fees recoverable for hours spent on the motion for leave to file the SAC should be further reduced.  *See Imwalle v. Reliance Med. Prod., Inc.*, 515 F.3d 531, 552 (6th Cir. 2008) (fees reduced when the prevailing party achieved partial success, citing *Hensley*, 461 U.S. at 435).  Finally, although block billing is not per se unreasonable, it can make it "inherently difficult to determine the reasonableness of the billing entries."  *Gibson*, 2014 WL 661716, at *4-5.  Here, for example, attorney Grabelsky spent 9 hours drafting and revising the motion for leave; drafting the first set of interrogatories, request for production of documents, and request for admissions; and drafting a deposition notice and serving it on MCC.  It is impossible to know what part of these 9 hours were spent drafting and revising the motion for leave.

The Court finds that 17 hours researching and drafting a motion for leave to file a SAC is not reasonable under the circumstances, to wit: it was the second motion for leave to amend that counsel filed and it was only partially successful.  Accordingly, the Court will award Plaintiffs' attorney fees for 3 hours researching and drafting the motion.  Thus, $3,150 (14 hours x $225) will be reduced from Plaintiffs' overall fee award.

In sum, Plaintiffs are entitled to fees in the amount of $28,778.02.[16]

---

[15] The second motion for leave, filed after the Court's deadline for doing so, included additional analysis under Fed.R.Civ.P. 16(b)(4).

[16] $28,778.02 = $33,334.77 – $4,556.75 (the total of the Courts reductions).

### IV. Conclusion

For the reasons state above, the Court GRANTS Plaintiffs' Motion for Summary Judgment (Doc. 29) in part to the extent that:

- Plaintiffs are entitled to contributions totally $86,407.20 from MCC;

- Plaintiffs are entitled to $25,798.64 in liquidated damages from MCC;

- Plaintiffs are entitled to $28,778.02 in attorney fees and costs from MCC.

The Court DENIES Plaintiffs' Motion in part to the extent that Plaintiffs seek judgment on a claim for a bond, as such a claim is not contained in the Second Amended Complaint.

Having dispensed with all claims, this case is hereby closed.

IT IS SO ORDERED.

Dated:  January 25, 2021

*/s/Kathleen B. Burke*
_____
Kathleen B. Burke
United States Magistrate Judge